Hughes v. Renshaw.

SARAH J. HUGHES and MARY L. EASLEY v. ROB-
ERT T. RENSHAW, WILLIAM C. RENSHAW,
FRANCIS A. RENSHAW, WALDO P. RENSHAW,
ADELBERT T. RENSHAW, HELEN GERTRUDE
HASTINGS, LOLA JENNINGS, JAMES REN-
SHAW, MAUDE DICKEY, HELEN RENSHAW
WADLOW, CARRICK RENSHAW, DELIA REN-
SHAW and MARY H. WOOKEY, Appellants.

Division One, April 12, 1926.

1. **MISJOINDER: Parties and Causes: One Transaction: Fraud.** Where
the owner of land executed as one transaction separate deeds of
gift to different brothers and nephews and nieces, conveying dif-
ferent tracts to each in severalty, a petition, instituted by his sis-
ters against all the grantees, to have the deeds set aside on the
grounds of fraud, mental incapacity and undue influence, is not
a misjoinder of defendants or causes of action. All the deeds hav-
ing been made at the same time and under the same undue in-
fluence, and if fraud operated to produce one of them the same
fraud operated to produce all of them, all of them were connected
with the same general subject-matter and were the same subject
of action, and if one of them is invalid all are, and therefore there
is no misjoinder, although the several defendants have distinct in-
terests under the several deeds.

2. ———: ———: ———: ———: **Evidentiary Facts: Promise to Con-
vey.** And misjoinder is not effected by evidentiary facts that one
of the brothers built a house on the tract conveyed to him in pur-
suance to the grantor's promise that if he built the house he would
convey the tract to him, since the evidence of the promise did not
tender a separate issue, but was only tended to negative the allega-
tions of undue influence.

3. **WITNESS: Grantees of Deceased Grantor: Fraud.** The cause of
action in issue and on trial being the alleged obtaining, by fraud
and undue influence practiced upon the deceased grantor, of eleven
deeds, each conveying to some one of the eleven defendants a cer-
tain tract of land in severalty, no one of the defendants, in the one
suit to set aside all the deeds for such fraud, is a competent wit-
ness.

4. ———: **Spouse of Defendant: Fraudulent Deed.** In a suit to set aside a deed alleged to be the product of fraud practiced upon the deceased grantor, the husband or wife of the defendant grantee is made a competent witness by the Act of 1921 (Laws 1921, p. 392) to testify to promises made by the grantor that if the grantee would do certain things he would convey to him or her the very land which he subsequently did convey. Such witness, as to such matters, does not fall within the disqualifications mentioned in the proviso to Section 5410. However, where there is an offer to prove such promise and other statements made by the deceased grantor in connection therewith, and such offer is preserved, the proffered testimony will be considered on appeal, with salient facts comprised within such offers appearing in proof through the testimony of other witnesses.

5. **EVIDENCE: Fraudulent Deed: Declarations of Grantor: Silence of Grantee.** The declarations of the deceased grantor in the deeds alleged to be the product of fraud, made after their execution, to the effect that in making them the grantees had overcome him, had pushed him into it, had railroaded it over him, are not admissible as such, because not against interest; but if made in the presence of such grantees, who it is alleged perpetrated the fraud, and they remain silent, their silence is in the nature of an admission that his repeated declarations were true, and the evidence respecting them, considered as a whole, is competent.

6. **CONVEYANCE: Testamentary Capacity.** Deeds, made by a very old man, in feeble health, by which, without consideration paid, he conveyed his lands to certain brothers and their children, retaining a life estate for himself, call for only testamentary capacity as distinguished from capacity to contract. Although for intervals during the preceding few years his mind may have been clouded, from disease and the use of morphine, he may still have had a testamentary mind.

7. ———: **Fraud: Fiduciary Relation: Burden of Proof.** Where the participation of the brothers, charged with exercising undue influence upon the grantor, in the transaction of his business, and their ministrations to him when he was ill, fail to show a fiduciary relation such as would raise a presumption of undue influence, the burden of proof as to that issue continues to be throughout the trial upon the plaintiffs who ask that the deeds be set aside on the ground that they were the product of undue influence exercised by the brothers on the deceased grantor.

8. ———: **Undue Influence: Evidence.** Undue influence, like fraud generally, can seldom be proved by direct and positive evidence. Though the grantor in the deeds alleged to be the product of undue

Hughes v. Renshaw.

influence, had sufficient mental capacity to make them, and the persons charged with exercising the undue influence did not occupy towards him what the law denominated a fiduciary relation, the intimate relation that did exist between him and them, and his impaired mentality and enfeebled physicial condition, are important facts to be considered in connection with other circumstances preceding and attending the execution of the deeds.

9. ————: **Sufficient Proof of Undue Influence.** If the aged grantor had done nothing more than convey eighty acres to each of two brothers, who had lived with or rendered him kindly ministrations for ten years, and sixty acres to the wife and daughter of a deceased brother for whom he had cared for years, the deeds would not be set aside; but where the two brothers went to the city, and had eleven deeds prepared, by which not only were said tracts conveyed to them, but a complete testamentary disposition of the grantor's six hundred acres was made, the children of said two brothers becoming the principal beneficiaries; the next day said grantees assembled at the grantor's house, and, a notary being sent for, he signed and acknowledged each of said deeds as they were handed to him, taking only a passive or no interest at all in the transaction; the brothers thought at the time he would not live long; his two near-by sisters were not called to the assemblage at his house, knew nothing of it and were not consulted; when one of the sisters told him what he had done, he was greatly distressed, and on different occasions said, in the presence of the brothers, that he had been overcome, that they had pushed him into it, that they had railroaded it over him, and they remained silent; and he thereafter employed a lawyer to bring suit to set aside the deeds, but under the influence of the brothers discontinued it, there was sufficient evidence, in connection with many other kindred facts, in the suit by the sisters, to sustain a holding that the deeds were the product of the undue influence exercised by the brothers.

10. ————: **Repudiation by Suit: Discontinuance: Subserviency to Will of Others.** The fact that the grantor, while in intimate association with his brothers, made deeds conveying all his lands to them and their children, then repudiated them and brought suit for their annullment when he came under the influence of his sisters, and then discontinued the suit as soon as he was back in the hands of his brothers, shows that he was completely subservient to the stronger wills of his brothers and sisters.

11. ————: **Ratification: Failure to Renew Suit: Moral Duress.** The aged grantor having caused suit to be instituted for the annullment of deeds when he discovered he had made them in subserviency to the wills of his brothers, and then discontinued the suit when he

314 Mo.—7.

again came under their influence, his failure to renew the suit before his death some months later cannot be regarded as ratification of the deeds, where he had for a long time been dependent upon his brothers for care, attention and companionship, and the thought of being deprived of them in his enfeebled condition doubtless operated as moral duress.

Corpus Juris-Cyc. References: Actions, 1 C. J., Section 263, p. 1100, n. 42. Deeds, 18 C. J., Section 131, p. 270, n. 22; Section 178, p. 243, n. 96; Section 502, p. 423, n. 2; Section 529, p. 434, n. 93, 98; Section 552, p. 445, n. 34; p. 446, n. 39. Evidence, 22 C. J., Section 413, p. 357, n. 98. Witnesses, 40 Cyc., p. 2212, n. 26; p. 2298, n. 83.

Appeal from Greene Circuit Court.—*Hon. Guy D. Kirby*, Judge.

AFFIRMED.

*John T. Sturgis* and *John Schmook* for appellants.

(1) The testimony as to the alleged statements made by the donor, since deceased, tending to defeat a gift, is inadmissible, being a self-serving statement and is incompetent for that purpose. Townsend v. Schaden, 204 S. W. 1076. (2) A grantee in one gift deed from the donor, since deceased, was not incompetent as a witness as to the gift, by said donor of a distinct tract of land under another deed to which contract witness was not a party. Snider v. McAttee, 178 S. W. 484; Gunn v. Thurston, 130 Mo. 339. (3) Carrie Renshaw was not incompetent as a witness even though Moses Renshaw was dead. She was not a party to the contract, nor is she a party to the cause of action. She was offered not as a witness to prove the contract between the donor, and her husband, but as a witness to the transaction between deceased and other defendants, each the donee of a distinct tract of land, under a different gift, and under a separate deed. Moreover, her testimony was not in favor of her husband who is claiming a deed to only eighty acres. Her testimony would be against her husband's interest since, as an heir, he would be entitled to one-sixth of six hundred acres. Gunn v. Thurston, 130 Mo. 339; Denny v. Brown, 193 S. W. 555. (4) Hiram

Wookey was a competent witness for the same reason. He was offered not as a witness to prove the contract between donor and his wife, but in behalf of the other defendants. Ray v. Westfalls, 267 Mo. 135. (5) When this case was tried, the statute disqualifying a wife as a witness in favor of the husband, or the husband in favor of the wife had been repealed. The court held that Carrie Renshaw and Hiram Wookey, were not competent because Moses Renshaw, the other party to the transaction was dead. Mere interest in the controversy does not disqualify and these proffered witnesses were in no sense parties to the cause of action on trial. The statute, Section 5410, removes the disability of interest in the controversy except that where one of the parties to cause of action on trial is dead, the other party thereto is disqualified. Southern Savings Bank v. Slattery, 166 Mo. 620; Citizens Bank v. Rombauer, 94 Mo. App. 690; Spithover v. B. & L. Assn., 225 Mo. 660; Lead & Zinc Co. v. Lead Co., 251 Mo. 721. (6) Defendants Robert T. Renshaw, William C. Renshaw and Adelbert Renshaw were competent witnesses to contradict alleged admissions of said defendants made after the execution of the deeds, since plaintiffs, claiming under the donor, since deceased, voluntarily testified as witnesses in their own behalf on the trial of this case, in chief, to such alleged admissions, over defendants' objections. Mason v. Mason, 231 S. W. 975; Hach v. Rollins, 158 Mo. 182; Weiermueller v. Scullin, 203 Mo. 466. (7) Under the evidence each defendant's plea in abatement should have been sustained and suit dismissed. Chaput v. Bock, 224 Mo. 73. (8) The decree is not supported by the evidence and is erroneous. (a) There was no undue influence proven, and the burden of proof remained in the court below with the respondents. 1 Redfield on Wills, (3 Ed.) sec. 38; Carl v. Gabel, 120 Mo. 283; Standfield v. Benninger, 259 Mo. 50. (b) The influence denounced by the law must not be such as flows from natural affection. It must be of that quality that there is present and in active exercise such undue influence as amounts to

over persuasion, coercion, or force, destroying the agency or will power of the grantor, and substituting therefor the will of another. The evidence does not make out a case of that character. Teckenbrock v. McLaughlin, 209 Mo. 551; McFadin v. Catron, 138 Mo. 138; Lorts v. Wash, 175 Mo. 502; Berberet v. Berberet, 131 Mo. 339; Martin v. Bowdern, 158 Mo. 379; Crowson v. Crowson, 172 Mo. 691; Sehr v. Lindemann, 153 Mo. 276; Defoe v. Defoe, 144 Mo. 458; Norton v. Paxton, 110 Mo. 456; McKissock v. Groom, 148 Mo. 459; Hamlett v. McMillan, 223 S. W. 1069; Taylor v. Walsh, 186 S. W. 526. (c) Proof of the opportunity, and motives of the grantees in the deeds, to exert undue influence over the grantor, are not sufficient; that such undue influence was used must be proven. Jackson v. Hardin, 83 Mo. 185; Hughes v. Rader, 183 Mo. 708. (d) The question is not, whether the heirs of Moses M. were defrauded, but was Moses M. Renshaw himself defrauded. Hamlett v. McMillan, 223 S. W. 1072.

*O. T. Hamlin* and *V. O. Coltrane* for respondents.

(1) The objection that the petition is multifarious is not well taken. Although there are several deeds, and the property is claimed by the parties defendant under different instruments, and may to that extent be considered distinct transactions, yet they are transactions connected with the same general subject-matter and subject of action, and therefore come within the requirement of the statute. There is one general right in the plaintiffs, and the claim of the defendants to the property in controversy is so far identified that, if the claim of one is invalid, the claim of all is likewise invalid. Secs. 1157, 1158, R. S. 1919; Tucker v. Tucker, 29 Mo. 354; Donovan v. Dunning, 69 Mo. 436; State ex rel. v. Railroad Co., 265 Mo. 692; Boggess v. Boggess, 127 Mo. 325. Plaintiffs may join in this suit. Breimeyer v. Bottling Co., 136 Mo. App. 84. (2) One defendant could not testify in favor of the other defendants without at the same time testi-

fying in his own behalf.  The cause of action in issue and on trial is whether these deeds were wrongfully obtained from Moses Renshaw, now deceased.  When one of the original parties to the contract or cause of action in issue and on trial is dead, the other party to such contract or cause of action will not be permitted to testify to any fact which he would not have been permitted to testify to at common law; that is, when one of the parties is dead the other party stands in regard to testifying precisely as if the statute allowing parties to testify had not been enacted.  Tomlison v. Lynch, 32 Mo. 160; Meir v. Thieman, 90 Mo. 442; Angell v. Hester, 64 Mo. 142.  To permit one defendant to testify in this case in favor of the other defendants would be to permit him to testify in his own favor and he would be as much a gainer by the result as if he had been nominally testifying in his own favor.  Meier v. Thieman, 90 Mo. 443; Vaughn v. Scade, 30 Mo. 600; Tomlison v. Lynch, 32 Mo. 160; Cook v. Neely, 143 Mo. App. 632; Hison v. Sigler, 68 Mo. 449.  (3) The wives and husbands of these defendants clearly had a marital interest in the property conveyed by these deeds and thereby became both interested and parties to the contract or cause of action on trial, and therefore were incompetent as witnesses. Forrister v. Sullivan, 231 Mo. 722; Tucker v. Gentry, 93 Mo. App. 655; Bieber v. Boeckmann, 70 Mo. App. 503; Goodale v. Evans, 263 Mo. 219; Oliver v. Johnson, 238 Mo. 359; Hyde v. Honiter, 175 Mo. App. 594; Swift v. Martin, 19 Mo. App. 488. The husband's or wife's right of action or claim to the property in controversy is derived to him or her from one who is disqualified by statute as a witness.  Sec. 5410, R. S. 1919; Norvell v. Cooper, 155 Mo. App. 445.  (4)   Even though the trial court may have erred in refusing to permit certain testimony to be offered there is no reversible error in the record. The testimony of plaintiffs is to the effect that he said something about giving this land to Mrs. Wookey. The exclusion of evidence that is merely cumulative and which referred to and had a tendency to prove a collater-

al matter and having no direct bearing on the real issue in the case could not have materially affected the merits of the defense, and under the statute will not work a reversal unless the court shall believe that error was committed against the appellants materially affecting the merits of the case. R. S. 1919, sec. 1513; Southern Bank v. Slattery, 166 Mo. 634; Renfrow v. Harber, 274 S. W. 103. In an equity case the admission or exclusion of evidence is rarely reversible error on appeal. Hanson v. Neal, 215 . Mo. 256. (5) No doubt Moses had confidence in the men who were preparing his meals, giving him his medicine, looking after his land, collecting his rents, holding his bonds, nursing him, greatly dependent upon them not only for these things, but for society and comfort, and that these same parties should have an undue influence over him would seem to follow as certain as effect follows cause. McClure v. Lewis, 72 Mo. 314; Cornet v. Cornet, 248 Mo. 184; Dingman v. Romine, 141 Mo. 475; Jones v. Belshe, 238 Mo. 524. (6) Mere silence, however long, or omission to act, is not an affirmance. Linville v. Greer, 165 Mo. 398. The influence which procured these deeds continued up to the time of Moses Renshaw's death, and the very influence that caused him to make them in the first place prevented him from taking action to have them set aside. McClure v. Lewis, 72 Mo. 314; Jones v. Belshe, 238 Mo. 524; Bray v. Haskins, 229 S. W. 1074.

RAGLAND, P. J.—This is a suit in equity to set aside, on the grounds of fraud, mental incapacity and undue influence, certain deeds conveying real estate. The evidence is too voluminous to attempt to set forth even by way of summaries the testimony of the fifty odd witnesses. However, the facts showing the general setting of the controversy, the parties thereto, their relations to each other and to the subject-matter of the action, are for the most part not in dispute. These will be given in general outline and then the specific evidence

which has a direct bearing on the issues will be noted with some detail.

The deeds which constitute the basis of the action were executed June 8, 1920.  Moses Renshaw, the grantor, at that time owned a body of land situated near the village of Cave Springs, in Greene County, of approximately six hundred acres.  He was seventy-five or seventy-six years of age, and had never been married.  He had three brothers then living: defendants, Robert T., William C. and Francis A. Renshaw.  Robert was about eighty years old; William sixty-five, and Francis sixty.  He also had two sisters: plaintiffs, Sarah J. Hughes and Mary L. Easley.  Mrs. Hughes was seventy-four years old; the age of Mrs. Easley was not disclosed.  Another brother, Howard, had died in 1900, leaving a surviving widow, defendant Delia Renshaw, and a daughter then of tender years, now defendant Mary H. Wookey.  Robert was a widower, and Francis a bachelor.  At the time of the making of the deeds they lived with Moses on a part of the six hundred acres in what was sometimes designated as the ''old Coltrane house'' and at others as the ''home place.''  They had been living with him for ten years, and during that time they and Moses had constituted the latter's household.

Robert had three children: defendants, Waldo P. and Adelbert T. Renshaw and Helen Gertrude Hastings. Waldo lived at Springfield, Adelbert on a farm a mile and a half west of Cave Springs, and Helen probably in the vicinity of Cave Springs.  William and his wife resided on a part of Moses' land, the house occupied by them being about a mile and a quarter from Moses' residence.  William had five children: defendants, Lola Jennings, Helen Renshaw Wadlow, Maude Dickey and James and Carrick Renshaw.  Lola and James lived at Cave Springs; Helen on a farm near Cave Springs; and Carrick and Maude in Springfield.  Delia and her daughter Mary had for twenty years lived about a mile and a half from Moses Renshaw and on part of his land.  Sarah

Hughes resided on a farm about six miles from that of her brother Moses. She had two children, a son and a daughter, both of whom lived with her. Mary Easley lived in Springfield, but during the summer of 1920 was sojourning in Colorado. She also had a son and a daughter. The former was living at Seattle, Washington, and the latter in Colorado.

Moses Renshaw had been a successful farmer and dealer in livestock. His business acumen and his mentality generally speaking had been above the average. However, for at least twenty years prior to 1917, he had been an habitual user of morphine, and during those years and on until his death he was a constant sufferer from asthma. In order that he and his aged mother might receive needed care and attention during illness he at one time built for their occupancy an addition to the house in which William and his family lived. As a result of the care and attention bestowed by William on his brother, during the three or four years that they lived in this close proximity, the latter became dependent upon the former for all ministrations for relief of both physical and mental ailments. After Moses had moved to the Coltrane house he sent for William whenever he was ill or out of sorts, and apparently that was quite often. It does not by any means appear that he was a chronic invalid, but if he was suffering from asthma or from melancholy superinduced by the morphine, he sent for William, and William always came—whether day or night.

During the ten years next preceding the making of the deeds in question Moses and his brothers Robert and Frank lived together in the old Coltrane house; William on Moses' land a mile and a quarter away; and Delia, the sister-in-law, on another part of the farm about a mile and a half distant. Frank was cook and housekeeper for his brother's household; Robert made garden, gathered up the eggs and did the other chores incident to a farmer's vocation; while William seems to have looked after the farm as a whole. Moses' business at the time consisted

for the most part of leasing his lands, collecting rents from the tenants—usually in kind—selling an occasional animal grown on the farm, marketing produce and paying the taxes. There was a great mass of testimony as to who performed the specific acts which constituted the transaction of that business. From this it appears that many of them were done by Moses himself, many by William, and still others by Robert and Frank. Appellants' conclusion from the evidence is that Moses continued to be the directing mind, his brothers being nothing more than his servants or errand boys. While respondents insist that the evidence demonstrates that the brothers, particularly William, wholly dominated the situation, Moses himself being passively acquiescent in whatever they did, it is probable that the truth lies somewhere between these two extreme views. Unquestionably the relations sustained by the brothers to each other were intimate and close.

On the trial defendants offered to prove by Mrs. Renshaw, wife of defendant William, ''that she was present on several occasions when Moses Renshaw talked with her husband about building on Moses' land, and that Moses requested her husband to build a house on it, come there and live and cultivate that tract of land, and that he at that time promised him if he would do that that he would deed him that tract of land, . . . that her husband accepted that proposition and that he built a house upon that tract of land at his own expense, built a three or four-room house; . . . that from the time that Moses Renshaw so requested her husband to build upon that tract of land, up to and including the time the deeds were made, Moses Renshaw always spoke of that land as the land of her husband, William C. Renshaw, and always treated it as such in conversations with parties at every time that he spoke of it at all.''

Defendants further offered to prove by Hiram Wookey, husband of defendant Mary, ''that some six or seven months prior to the making of the deeds in issue here, he had a conversation with Moses M. Renshaw,

in which he made known to Moses M. Renshaw, that he and his wife, Mary Wookey, contemplated moving to Canada, and in that conversation Moses M. Renshaw asked him to stay down there in that neighborhood where he was then living, and told him that the land which he has since deeded to Mary Wookey he intended to give to her, and wanted this witness, her husband, to remain there so that he could look after it.''

The proffered testimony was rejected on the ground that the witnesses were incompetent, in this: they were the spouses of parties to the contract or cause of action in issue and on trial and the other party thereto was dead. Aside from the proof thus tendered it abundantly appears from the evidence that Moses Renshaw many years before his death had turned over to William the possession and control of the eighty acres on which the latter had built a house and that thereafter Moses always spoke of the land as William's. It also appears that soon after the death of Howard, Moses installed his widow and daughter, Delia Renshaw and Mary Wookey, in a home on his land, and in that connection turned over to them a tract of sixty acres which he afterward referred to as their land. The evidence further discloses that he often spoke of another eighty acres as being that of his brother Robert's. He continued, however, to pay the taxes on all the land.

Plaintiffs after the death of their mother, which occurred in 1914, did not go to the home of their brother Moses as frequently as theretofore. But he and they continued to exchange visits from time to time and their relations never ceased to be entirely friendly and cordial.

In 1920 Moses Renshaw had resumed the use of morphine. In addition to having asthma he was then afflicted with a kidney trouble. About two weeks before the execution of the deeds in question he was taken to a hospital in Springfield by Robert and William for treatment for the drug habit, or the kidney affection, or possibly both. After remaining there about one hour

he insisted upon being taken home, saying that he was afraid he was going to die. With respect to his condition at that time one of the plaintiffs testified:

"Frank told me brother Moses was taking it (morphine) as usual. They had very bad times with him of nights. He was restless and couldn't lie down and would walk and moan and talk all the time, and they couldn't hardly get any sleep, any of them, and that Moses asked him to give him some morphine. That was the week before the deeds were signed sometime. He was sick about two weeks and in that wretched condition."

The deeds were made on Tuesday. On the Sunday preceding Moses had a conversation with a neighbor, Campbell Shelly. With reference to that conversation Shelly testified: "I saw him the Sunday before that down at his house and talked to him. Robert was there on the porch when I went. They were sitting on the porch. Moses recognized me. He said, 'How do you do? Come in and take that chair.' We were sitting there talking, and Moses said, 'Robert you go out and stop Willie as he comes by from the church.' Robert left and started down the road to tell him to stop as he came by. That left Moses and me. . . . He said, 'I have been aiming to fix up some business here and haven't done it, I am going to give Delia Renshaw the home where she lives. . . . I am going to give Mary that sixty acres up by Waterloo,' he said, 'I promised to look after Delia and Mary, and that will be looking after them, won't it?' and I said, 'It certainly will.' He further said, 'Sis has got a good farm and just two children and I will give her money.' He meant Sarah Hughes. He said Molly lived out west and he would give her money. He meant Molly Easley. . . . By that time Robert and Will had come up on the porch and he said no more."

The next day (Monday) following the incident just narrated Robert and William Renshaw and their sons Adelbert and James went to Springfield and caused to be prepared by an attorney selected by them deeds which when executed would effect a parcelling out among

defendants of all of Moses Renshaw's land, except about thirty-two acres on which his residence stood, the home place. The next morning the deeds which had been so prepared were on hand at his residence and the beneficiaries-to-be, or most of them, had assembled there to receive them. One of the defendants telephoned a notary who in response came to take the acknowledgments. The notary found Moses in one room sitting in a rocking chair and the others congregated in an adjoining room, where the deeds were spread out on a table. Presently it developed that Frank was not satisfied with the deed which had been prepared for him, because thereby he was allotted only twenty acres. He gave them to understand that he would not be satisfied unless the home place was also conveyed to him. Delia Renshaw also expressed dissatisfaction, because the land which she was to get under the deed drawn for her did not include a spring. After some conference, in which Moses was "consulted," the notary was directed to prepare an additional deed for the conveyance to Frank of the home place, and to amend the description in Delia's deed so that it would include the land on which the spring was situated. When the deeds were ready for signature they were taken one at a time to Moses who was told what the instrument was and where to sign it. As he signed each his acknowledgment was taken in the usual conventional form. As the notary filled out the certificates of acknowledgment and attached his seal he laid the deeds on a table. After he had finished, each of the grantees present walked up and picked up his deed. Who took the deeds of those not present is not disclosed. After Robert had gotten his deed he took it in to Moses, handed it to him and said: "Moses here's my deed. Now hand it back to me while Mr. Cloud (the notary) is here; I want him as a witness.'" Moses took the deed and handed it back.

Dr. Pipkin of Springfield, who had been called to see Moses professionally, was present at the signing of

the deeds.    Excerpts from his and Cloud's testimony give color to the events that then transpired:

CLOUD:  ''We came back [from surveying the ground where the spring was located] and in making the deeds to Frank Renshaw to the home place, and after making this deed to Delia Renshaw, I asked in regard to the tract in front of the house. I think I suggested myself, for that was all there was left, why not give it to Frank, about two acres. Robert said he didn't think it ought to be done. He said if it was him he wouldn't do it. I don't think Uncle Moses really consented to making it.  We were talking about it, and as I remember, Uncle Moses said he didn't care, and Robert remarked, 'I wouldn't die a pauper. I would have a little land when I died,' and Uncle Moses said, 'Oh, well, we don't want to have any trouble about it, we will let it go.' The small tract was not put into the deeds. Moses didn't seem to be interested whether it went into the deed or not. It seemed that he didn't care. He was very weak physically. . .

''He seemed to understand about the deeds, whom they were to and what they were for, etc. He was capable of transacting business there that day. Except his physical condition, I didn't see anything wrong. He seemed to understand what he was doing, but he was weak physically. His mental condition was about as good as any man in his condition could be. If there was anything wrong mentally, I didn't notice it. . . .

''He didn't express any dissatisfaction, he simply signed them, he was physically weak and seemed to be suffering some. He didn't discuss them at all, he only signed them. . . .

''I wouldn't say he was indifferent; he acted to me like a man that had sold some property, or was giving away some property, he wanted to sign the deeds and get it off his hands.''

PIPKIN:  ''I was present when the deeds were presented to Moses Renshaw for his signature. One of his brothers, I couldn't say whether it was Sam, John or Bill, brought them in. It was the brother I described

with the gray beard. That is the way I remember it. I didn't pay very much attention to what was said, except that Uncle Moses signed the papers. I heard them come in and say: 'Here's the papers for John and Jim, etc.; that is so and so's papers,' and Uncle Moses signed it. He showed him where to sign. As well as I remember he told him where to sign. It seems to me he made as much as two trips, as well as I remember, in going out and coming back with another deed. As to Uncle Moses' mental condition at the time he signed these deeds, I was not able that evening to get anything very definite out of Uncle Moses. The most of what I got about his history was from the other man. I didn't get much of history, the history I got from him, I couldn't tell much about his condition from his statement, he was rather non-committal, he didn't have a great deal to say, although he recognized me as being Dr. Pipkin, and seemed glad to see me anyway, but I was rather surprised at his attitude toward me that evening, he had so much less to say than he did have at the time I had been with him before. As to whether from his appearance there he showed any evidence of comprehending what was going on there, he wasn't paying much attention to what he did sign, it didn't seem to impress his mind, it just reminded me that he had either talked it over, or couldn't understand what he was signing, at least it didn't make much of an impression on him. . . .

"Q. In giving you a history of his case, or in talking with you about matters there, were his statements connected? A. Not very well, just like I said a few minutes ago, I wasn't able to get very much that I could form an opinion on, from Uncle Moses; I depended more on the other people.

"Q. Did he talk intelligently? A. He just didn't seem to have much interest in himself. He seemed to think there was not much to say. . . .

"Q. Did you say his answers to your questions were intelligent? A. I wouldn't say they were not intelligent,

but it seemed to me they lacked the proper meaning, or something to that effect. . . .

"With reference to what his trouble was, I did not find anything certain. I thought maybe his kidneys were in bad condition that day. The way I remember it, I didn't find anything positively that would cause the condition the mind was in. His feet were swollen, they told me they were not so swollen then as they had been; it seems to me his face was swollen a little bit. That could mean different things, usually we take it as a person's kidneys out of order, uraemic poisoning, or something on that order. In a great many cases, that affects the mind. . . . "Q. What did you say about whether or not in your opinion, from what you saw of him and of the talk you had with him, and your observation of his condition and everything that took place, whether or not he had mind enough on that day to understand what he was doing when he executed those deeds dividing up his farm among his relatives? A. It appeared to me, after I had made a conclusion something about his case, that he did not fully realize. I don't think he did."

The deeds signed by Moses Renshaw on the occasion just referred to and which are sought to be annulled by this proceeding were eleven in number. With reference to the grantee, the consideration expressed and the number of acres conveyed, they were as follows: (1) William C. Renshaw, $3200, 80; (2) Mary H. Wookey, $3500, 60; (3) Waldo P. Renshaw and Adelbert T. Renshaw, $3200, 80; (4) Robert T. T. Renshaw and Helen Hastings, $4000, 80; (5) Delia Renshaw, $1200, 40; (6) Lola Jennings, $600, 16; (7) Helen N. Renshaw and Mary Maude Dickey, $3200, 80; (8) Carrick J. Renshaw, $1600, 40; (9) James A. Renshaw, $4000, 80; (10) Francis A. Renshaw, $800, 23; (11) Francis A. Renshaw, $1600, 32.

In all of the deeds a life estate was reserved to the grantor. Notwithstanding a consideration was expressed in each deed none in fact passed.

The remaining portion of this statement of facts is based principally on the testimony of the two plaintiffs:

The second day after the deeds were made Mrs. Hughes, having heard that her brother Moses was sick, endeavored to call his home over the telephone. Being unable to get any response she called William's home and his daughter, Helen, answered. She told Mrs. Hughes that Uncle Moses was "pretty sick." Mrs. Hughes then asked if they wanted her to come; Helen, after conferring with her father, said they would not need her that night. Mrs. Hughes went anyway, and found her brother exceedingly ill. She remained there for two weeks. Shortly after her arrival she heard for the first time about the deeds. Robert told her about them in detail and assured her nothing wrong had been done; that Moses had not been permitted to have any morphine for at least thirty-eight hours before he signed them. He further explained that she and Mrs. Easley at Moses' death would get Government bonds and cash to the extent of $2,000 each if they made no trouble about the deeds. Robert further told her that Moses was very sick, and the doctor didn't think he would live long, and that Waldo and Adelbert had been to Springfield to arrange for a bond, so that they could take out letters of administration on Moses' estate as soon as he died. Robert it seems was then in possession of Moses' Government bonds, of the par value of approximately $3700, and that he retained the possession until after Moses' death.

While it does not appear that Mrs. Hughes upbraided her brother for what he had done, yet Robert and William accused her of making him dissatisfied. In any event Moses was soon walking the floor, moaning and groaning, and saying: "Oh Lord, have mercy, I never meant to do it; I never meant to treat you (Mrs. Hughes) that way and I never meant to treat Mary that way." He repeatedly said in the presence of Robert and William: "They pushed me into it. I never meant to do it that way. They railroaded it over me." But

Robert and William remained silent. On another occasion he said: "I have deeded away everything I have, I am ruined." Robert or William one said: "You did it, we didn't." He repeatedly requested them to deed the land back to him, but they neither said nor did anything. At the time of making one of such requests he said that a reconveyance of the land would aid his mental condition, but Robert replied that that would not help his mental condition a bit. Mrs. Easley came the early part of July, and thereupon all the scenes of storm and stress which had occurred on Mrs. Hughes's coming were re-enacted. A few weeks later Moses, accompanied by his two sisters and Frank, went, or was taken, to Springfield, and while there he employed an attorney, Mr. V. O. Coltrane, to bring suit to have the deeds annulled. After making all the arrangements, including the paying of a filing fee, he returned to his home. Early the next morning Mr. Coltrane was called over the telephone by William and informed that Moses wanted the suit dropped. Coltrane said that it would be necessary for him to talk with Moses himself; thereupon the latter came to the phone, and confirmed what William had said. Moses lived until November, 1921, during the most of which time both his physical condition and his mental condition were as good as they had been during the two or three years next before the making of the deeds.

The specific grounds of the action will be disclosed by the following excerpts from the petition:

"That on or about June 1, 1920, said Moses M. Renshaw was afflicted with asthma and a disease of the kidneys to such an extent as to make life almost unendurable; that a short time prior to June 8, 1920, said Moses M. Renshaw got possession of and for some days took a large quantity of morphine; that after the said Moses M. Renshaw was unable to get more of said drug and the quieting effect thereof had worn off said Moses M. Renshaw became very nervous and sick in mind and body, and so weak in mind and body that those around him

thought, or professed to think, that he was about to die; that the defendants, Robert T. T. Renshaw and William C. Renshaw conspired together to defraud the said Moses M. Renshaw and his prospective heirs and set about by unjust, unlawful and improper and fraudulent means to obtain his property from him and on or about June 8, 1920, caused him to make to the said defendants certain deeds. . . .

"That all of said deeds were made at the same time and under the same undue influence; that said deeds were obtained by and through undue influence exercised over said Moses M. Renshaw by said defendants with a view to deprive the plaintiffs herein of their rights in said land. . . .

"That defendants in various ways, by false statements and by false pretenses of love and affection for the said Moses M. Renshaw and owing to his then weakened mental condition, overpowered his mind and will and subjected the same to their own domination, so that in fact their will and intention wrongfully supplanted the will and intention of said Moses M. Renshaw, and dominated and controlled the mind and will of said Moses M. Renshaw in the acts and conduct in making said deeds hereinbefore mentioned. . . .

"That the said Moses M. Renshaw from and after the said 8th day of June, 1920, until the date of his death, never ceased to beg and plead with defendants for the return of his property, but never recovered his mind and will power sufficiently to assert his legal rights in said property, but remained subject to the domination and control of said Robert T. T. Renshaw and William C. Renshaw until his death on the 3rd day of November, 1921.''

The petition further charged that Frank, Robert and William, by reason of their having had possession and control of the private papers of Moses Renshaw and the management of his business as well, sustained to him a confidential and fiduciary relation.

Each of the defendants filed a separate answer, which after denying specifically the allegations of the petition contained what is termed a plea in abatement. The plea in abatement in each instance was in the following language:

"For further answer this defendant says that there is a misjoinder of defendants and a misjoinder of causes of action herein, in that defendants do not in the instance of every tract described in plaintiffs' petition claim interests adverse to plantiffs in the same tracts, and therefore a separate action should have been brought against the different defendants or different groups of defendants, severally interested and claiming, or jointly interested and claiming, adversely, in any one of said tracts of land. This defendant claims only the particular tract of land specifically described in said deed to him, dated June 8, 1920, and he owns same in severalty, and none of the other defendants claim any interest therein, nor does this defendant claim any interest in any of the land described in plaintiffs' petition other than said —— acre tract of land given and deeded to him. This defendant has separate and distinct issues with plaintiffs, and in which said other defendants are in no wise whatsoever concerned, nor is this defendant in any way concerned with the plaintiffs' issues with another or with any of the other numerous defendants. Wherefore this defendant says that on account of said facts plaintiffs are not entitled to maintain this joint action, and prays the court to abate said action."

Each of the defendants further averred that the deed to him was in confirmation of a gift of the land conveyed previously made by the grantor, the circumstances of which were in each instance set forth at length.

The trial court made a general finding of the issues for plaintiffs and entered a decree setting aside the deeds. From such decree all of the defendants except Francis A. Renshaw prosecute this appeal.

Appellants assign as error: (1) the failure of the trial court, after hearing the evidence, to sustain their respective pleas in abatement; (2) the refusal to permit each of the defendants to testify in behalf of his co-defendants; (3) the ruling that the spouses of certain defendants were incompetent as witnesses; (4) the admission in evidence of certain declarations of the grantor made after the execution of the deeds; and (5) the finding of the issues for plaintiffs, which they assert is against the greater weight of the evidence.

I. Appellants' first contention is that there was a misjoinder of both defendants and causes of action. In a pioneer case in this State, Tucker v. Tucker, 29 Mo. 350, it was held that where a husband, in anticipation of death and with a view to deprive his widow of her dower, executed as one transaction separate deeds of gift of his slaves to his children, a petition instituted by the widow against all of the grantees in said deeds to obtain an annullment thereof and an assignment of dower would not be multifarious because of defendants' distinct interests under their several deeds. In discussing the question this court said:

**Misjoinder.**

"Although there are several deeds, and the property is claimed by the parties defendant under different instruments, and may to that extent be considered distinct transactions, yet they are transactions connected with the same general subject-matter and subject of action, and therefore come within requirement of the statute. [R. C. 1855, p. —, art. 6, sec. 2.] There is one general right in the plaintiff, and the claim of the defendants to the property in controversy is so far identified, that if the claim of one is invalid, the claim of all is likewise invalid. The defendants are all alike concerned in sustaining the deeds conveying the property and defeating the plaintiff's action. It is true the property is held under distinct conveyances, but the gravamen of fraud equally applies to all of them. If one of the conveyances is fraudulent, all are fraudulent, and all the

property thereby conveyed is affected by the plaintiff's claim of dower.''

The rule of pleading announced in Tucker v. Tucker has been followed and approved in many subsequent cases. [Donovan v. Dunning, 69 Mo. 436; Bobb v. Bobb, 76 Mo. 419; Boggess v. Boggess, 127 Mo. 305; State ex rel. v. Railroad, 265 Mo. 646.] Appellants conceding the force of these decisions aver that the petition, inasmuch as it alleged ''that all of said deeds were made at the same time and under the same undue influence,'' was invulnerable to attack by demurrer. But they contend that facts pleaded in the separate answers and the proof offered in support of them disclose that as between plaintiffs and the several defendants there were distinct and separable issues. In this we are unable to concur. The petition charged that fraud and undue influence operated to produce a single result, the execution of eleven deeds. The issue was: Were those deeds executed by Moses Renshaw, or by Robert and William Renshaw through control of Moses' will? The evidentiary facts relating to William's having built a house on eighty acres of Moses' land in reliance upon the latter's promise to deed the land to him did not tender a separate issue; those facts were relevant simply because they tended to negative the allegations of the petition with respect to undue influence. As to the essential and controlling issue, that of undue influence, the defendants were all concerned alike, though their rights, if any, under the deeds were separate and distinct. The pleas in abatement were properly overruled.

II.   The ''cause of action in issue and on trial'' was the alleged obtention of eleven deeds through fraud and undue influence, as pointed out in the preceding paragraph. Moses Renshaw was one of the original parties to that cause of action and the defendants, the grantees in the deeds, were the ''other party'' thereto. **Witness.** As the former was dead the latter were disqualified as witnesses by the statute. [Sec. 5410, R. S. 1919.]

The trial court, following no doubt the opinion of Mr. Commissioner Brown in Mason v. Mason, 231 S. W. l. c. 975, held that defendants were competent to testify as to matters "existing and accruing subsequent to the death of Moses Renshaw." In view of that ruling appellants can have no just cause for complaint in respect to the matters considered under this head.

III.   The trial court was clearly wrong in holding that the wife of defendant William Renshaw and the husband of defendant Mary Wookey were not competent as witnesses.  The Act of 1921 (Laws 1921, p. 392) wholly removed, except as to confidential communications, the common-law disqualification of husband or wife to testify in a proceeding to which the other was a party.  And the general disqualification of interest has long since been done away with by what is now Section 5410, Revised Statutes 1919.  [Weiermueller v. Scullin, 203 Mo. 466, 473; Edmonds v. Scharff, 279 Mo. 78, 87.]  However, the latter statute after abrogating the common-law rule that interest in the event of a suit disqualified a witness, in a proviso, makes disqualifications of its own.  [LAMM, J., in Griffin v. Nicholas, 224 Mo. l. c. 327.] · They are:  (1) "When one of the original parties to a contract or cause of action in issue and on trial is dead, or . . . insane, the other party to such contract or cause of action shall not be admitted to testify," etc.;  (2)  "no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing disqualifications, shall be admitted to testify in his own favor," etc.; and  (3) "where an executor or administrator is a party, the other party shall not be admitted to testify in his own favor," etc.  Mrs. Renshaw and Mr. Wookey were competent to testify unless they fell within one or the other of the classes of persons disqualified under the specific provisions of the statute just quoted, and it is entirely clear that they did not.  In weighing the evidence we

Defendant's Spouse.

have treated the offers of proof which were rejected as the testimony respectively of these two witnesses. We do this largely because the salient facts comprised within such offers appeared in proof through the testimony of other witnesses. Otherwise, we would feel constrained to reverse the judgment and remand the cause for another trial in order that the rejected testimony might be received.

IV.    The declarations of Moses Renshaw heretofore referred to were not admissible *as such* because not against interest. But the silence of Robert and William in the face of repeated statements made by Moses in their presence, that in the matter of the making of the deeds they had overcome him, pushed him into it, railroaded it over him, was in the nature of an admission that his charges were true. The evidence with respect to the declarations considered as a whole was therefore competent.

Declarations of Deceased.

V.    The making of the deeds in question under the circumstances of this case called for only testamentary capacity on the part of the grantor as distinguished from the capacity to contract. That Moses Renshaw had that capacity there can be but little doubt. In the latter years of his life there may have been brief intervals during which his mind was clouded, as a result of the use of narcotics, or from the effects of disease, but the evidence does not warrant a finding that at the time of the execution of the deeds he did not have a mind and memory capable of presenting to him his property and the persons coming reasonably within the range of his bounty.

The evidence with respect to the participation of Robert and William in the transaction of their brother's business and their ministrations to him when he was ill was not set out in detail, because after considering it we were unable to find that it showed a fiduciary relation such as would raise a presumption of undue influ-

ence. The burden of proof as to that issue continued therefore to be upon plaintiffs throughout the trial. [Spurr v. Spurr, 285 Mo. 163, 177.]

It only remains to consider the question of undue influence: Whether the making of the deeds was the act of Moses Renshaw, or whether that of Robert and William, effected by them through the dominance and control of Moses' will. In determining the question all the facts and circumstances must be looked to, for undue influence, like fraud generally, can seldom be proved by direct and positive evidence. In this connection it should be noted that though we hold that the grantor had sufficient mental capacity to make the deeds and that his brothers did not occupy toward him what the law denominates a fiduciary relation, yet the intimacy of the relation that did exist between him and them and his impaired mentality, as well as his enfeebled physical condition, are important facts to be considered in connection with the other circumstances, both those which preceded and those which attended the consummation of the transaction.

If Moses Renshaw had done nothing more than convey to Robert eighty acres of land, to William the eighty on which the latter's house stood, to Delia Renshaw and Mary Wookey the sixty-acre tract upon which he located them soon after Howard's death and to Frank a proportionate parcel, plaintiffs would have no case. What was done, however, was not the carrying out of a purpose which might be presumed to have been long in the grantor's mind; it was a complete testamentary disposition of his landed estate under which the children of Robert and William became the principal beneficiaries. Robert and his children received 160 acres, valued, according to the consideration expressed in the deed, at $7,200; William and his children 296 acres valued at $12,600; Frank 52 acres valued at $2,400; and Howard's widow and daughter 90 acres valued at $4,700. (There was evidence tending to show that the value of the land greatly exceeded the considerations named in the re-

spective deeds.) While neither of the grantor's two sisters, these plaintiffs, nor their children, received anything. But according to the plan of distribution Mrs. Hughes and Mrs. Easley were to get $2,000 each at their brother's death if they made no trouble about the deeds to the others.

There was no competent evidence of any probative force that Moses Renshaw loved his sisters any less than he did his brothers. On the contrary the great distress under which he labored for weeks after he came to a realization of the discrimination against them effected by the deeds conclusively showed the warmth of his affection for them. The fact that one of them owned a 200-acre farm and the other had been out West did not then suggest itself to him as a reason for excluding them in the division of his lands.

When Moses Renshaw's estate was about to be divided all of his ostensible heirs were called in conference, or else brought themselves together for the purpose, except his two sisters. In that conference they adjusted and accommodated their differences in regard to the lands to be alloted to each. Mrs. Hughes who lived only a few miles away was not given any notice of the proceeding; she was given no opportunity to say whether the reception of $2,000 at her brother's death in lieu of all other interest in his estate would satisfy her. She had not been advised as to the condition of his health although he was "pretty sick" and the doctor had said he would not live long. Not only that, but two days later when she called over the phone to inquire about her brother she was reassured and told that his condition was such as not to require her presence.

Just prior to the making of the deeds Robert and William thought Moses' death would not be long deferred. So far as the evidence discloses all the steps taken in anticipation of that event were taken by them, or under their direction; whether upon their own initiative, or that of Moses, must be judged from the circumstances. They went to Springfield and had the deeds

drawn by a scrivener according to their directions; they brought the deeds home and had a notary called to take the acknowledgments; in composing some differences which arose with respect to a division of the land they, or at least Robert, exercised a dominating influence. Moses at the time of the signing of the deeds, according to the notary and Dr. Pipkin, manifested no interest whatever in the proceeding; he merely assented to the conclusions reached by the others, and after the instruments· were made to conform to their· wishes signed them as and when told to do so, and on the line pointed out to him. Pipkin was of the opinion that he did not comprehend what was going on. That he devised a plan whereby his sisters were to have $2,000 each at his death if they made no trouble about the deeds; otherwise nothing, is not believable.

The implied admissions resulting from the silence of Robert and William when on different occasions they were charged by Moses with having overcome him in the matter of the execution of the deeds has already been adverted to. The very fact that he made the deeds while in intimate association with his brothers, repudiated them and brought suit for their annullment when he came under the influence of his sisters, and then discontinued 'the suit as soon as he was back in the hands of his brothers, shows that his will was completely subservient to the stronger wills of his brothers and sisters.

Moses Renshaw's failure to renew his suit cannot be regarded as a ratification of the deeds. It evidences rather his subjection to the same influence which originally brought about their making. He had so long been dependent upon his brothers for care, attention and companionship that the thought of being deprived of these no doubt operated as a moral duress.

Without further recapitulation, it is sufficient to say that the evidence is ample to support the finding of the chancellor who heard the cause *nisi*. In that finding we concur. The judgment is therefore affirmed. All concur.